IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 13, 2010 Session

## SHANNON WRIGHT CLEMENT v. MARK CLEMENT

**Appeal from the Chancery Court for Rutherford County**
**No. 07-0552DR     Royce Taylor, Judge**

**No. M2009-00466-COA-R3-CV - Filed September 28, 2010**

The divorcing parents of two minor children entered into a parenting plan that named the mother as the primary residential parent of the children, but divided parenting time equally between the parties. Less than a year after their divorce became final, the mother moved from Murfreesboro to Franklin, and the parents filed competing petitions to modify the parenting plan. The trial court conducted two hearings and ultimately adopted a new parenting plan which provided that the mother would remain the primary residential parent and that the father would exercise only standard visitation. The father appealed. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT, J., joined; RICHARD H. DINKINS, J., joined in the result only.

John D. Drake, Murfreesboro, Tennessee, for the appellant, Mark Clement.

Sonya W. Henderson, Murfreesboro, Tennessee, for the appellee, Shannon Wright Clement.

### OPINION

#### I. DIVORCE AND A PARENTING PLAN

Mark Clement ("Father") and Shannon Elizabeth Clement ("Mother") married on October 26, 1996. Their marriage produced two children, Preston, born on December 30, 1997, and Porter, born on October 23, 1999. Mother filed a Complaint for Absolute Divorce in the Chancery Court of Rutherford County on April 10, 2007. The stated grounds were irreconcilable differences and inappropriate marital conduct.

Prior to divorce, the parties entered into a Marital Dissolution Agreement (MDA) and a Parenting Plan to settle their property rights and divide their parental responsibilities. The trial court granted an absolute divorce on the ground of irreconcilable differences after a hearing, and approved both the MDA and the Parenting Plan. The final decree of divorce was filed on January 4, 2008. The Parenting Plan designated Mother as the primary residential parent of the parties' two children, but divided parenting time equally between the parties, with custody alternating weekly. No child support was awarded.

Although the parties both agreed to the parenting plan, they did not follow the schedule it described. Mother worked as a registered nurse at Bedford County Hospital for three years. The job involved three twelve-hour night shifts each week. After the divorce, she was hired for a new job at Vanderbilt's Stallworth Rehabilitation Hospital with very similar hours but slightly more flexibility. Father's work schedule as a plumbing contractor in Murfreesboro depended on the volume of his work and the needs of his customers.

Accordingly, the parties did not transfer custody of the children weekly as specified by the Parenting Plan, but instead transferred the children from one parent to another as needed to accommodate their different work schedules. They also sometimes had to call upon their parents or a baby-sitter to look after the children. Father testified that despite the irregularity of their schedules, the parties still managed to divide parenting time with the children more or less equally. Mother testified that this was not so. She stated that Father was unavailable to take care of the children for weeks at a time and that she exercised far more parenting time with them than he did.

The current dispute had its genesis in Mother's announcement to Father in June or July of 2008 that she had decided to move from Rutherford County to Williamson County. She subsequently moved to a rental house in Franklin. Mother testified that her primary motivation for moving was to be closer to her parents and other family members who could help her look after the children.

Father responded by filing an Emergency Petition for Restraining Order and Modification of Parenting Plan on July 28, 2008. He contended that it was not practical for the parties to share equal parenting time if they were living in different counties, and he asked to be named as the children's primary residential parent. Father claimed that Mother's intention to transfer the children from their elementary school in Murfreesboro to an elementary school in Franklin was not in their best interest, and he argued among other things that such a change would make it difficult for him to continue to participate in their schooling and in extra-curricular activities like Cub Scouts. Father also alleged that on April 9, 2008,

Mother had engaged in violent behavior in front of the children.[1]

Father accordingly asked the trial court to issue a temporary order prohibiting Mother from relocating the children or transferring their schooling. He also asked for a new parenting plan to be adopted in which he would be designated as the Primary Residential Parent. Mother filed an Answer and Counter-Petition for Modification of the Parenting Plan on September 28, 2008.

## II. THE HEARING ON THE EMERGENCY PETITION

The trial court conducted a lengthy hearing on Father's emergency petition on August 5, 2008. Father and Mother both testified, as did Mother's mother and Father's girlfriend. The parents offered conflicting testimony as to how much time each of them had taken care of the children. Mother testified that she agreed to an equal division of parenting time in the original parenting plan because "he wore me down" by refusing to leave the marital residence and by being uncooperative when all she wanted was a divorce so she could get on with her life.

Mother stated that in any case she did not believe at the time that Father would even come close to being available to care for the children half of the time, and she declared that events proved her to be correct because Father only intermittently exercised his parental responsibilities. For his part, Father testified that he did take care of the children about half of the time up until April of 2008. He alleged, however, that Mother started interfering with his parenting time after that date by withholding the children from him.

Father was also questioned closely about his alcohol and marijuana consumption. He testified that on average he drinks four or five beers every day after work. He also admitted that he used marijuana frequently during and after his marriage, but denied doing it in the presence of the children. He claimed that he had stopped smoking marijuana a few weeks earlier when he realized his habit was jeopardizing his parental rights. He was asked if he would be able to pass a drug test that day. He said he would likely fail, but that he was willing to give it a try.

---

[1]Father attached to his petition a police report based on a complaint for domestic vandalism he had filed against Mother on April 9, 2008. The narrative portion of the report stated that the incident began when Mother arrived at his house to drop the children off so he could take them to school. She banged on his door because he did not wake up in time. Father answered the door and the children entered the house. An argument between Mother and Father followed, which ended with Father locking the door and Mother kicking the door and breaking the bottom right pane of glass. Mother's account of this incident is somewhat different from Father's.

The parties were both questioned about the children's schooling. They testified that Preston and Porter were enrolled in the highly-rated McFadden Elementary School in Murfreesboro, and that they were both doing well in that school's program for gifted students. Father declared that he was opposed to any transfer out of that school, arguing that such transfer would be to the children's disadvantage and would make it difficult for him to help them with their schooling. Mother stated that she wanted to transfer them to Hunter's Bend Elementary, a highly-rated school in Franklin that is less than one hundred yards away from her new home, and which also houses a program for gifted students.

The situation of Father's girlfriend and fiancé Jennifer Ogden was the subject of testimony by both Mother and Father, as well as by Ms. Ogden herself. The proof showed that Ms. Ogden was a victim of domestic assault by her former husband, and that he had also stalked her.[2] Mother feared for the safety of her children if a violent stalker was likely to show up at Father's house. But Father testified that the former husband was in jail in Montgomery County, Ohio, and was awaiting sentencing for violating probation on an eight year sentence. Ms. Ogden testified that she never spent the night in Father's house when the children were present out of respect for Mother's wishes. The proof also showed that Ms. Ogden has never had a drivers license because she has no peripheral vision and is legally blind in one eye. Nonetheless, she drove the children short distances on a few occasions when Father was not available.

At the conclusion of testimony, the trial court announced its decision from the bench. The court declared that it was disappointed with the parties because they had both perjured themselves when they had signed on to the parenting plan that was incorporated into the final decree of divorce. The court cited the provision in the parenting plan which stated, "[u]nder penalty of perjury, we declare that this plan has been proposed in good faith and is in the best interest of each minor child and that the statements herein and on the attached child support worksheet are true and correct."

In its ruling, and its subsequent order, entered on August 14, 2008, the court stated that the parenting plan that had been agreed to was not in the best interest of the children and that "the parties have perjured themselves before this honorable court by entering into a parenting plan they never intended to use." The court also found Father to have serious drug and alcohol problems and ordered him to undergo a drug and alcohol assessment. Father's overnight visitation was suspended pending further orders of the court, but he was granted daytime visitation every Saturday. The children were to remain at McFadden Elementary for

[2]The proof indicates that Ms. Ogden's divorce from her husband was not yet finalized at the time of the hearing on Father's emergency petition. Father's attorney, who also represented Ms. Ogden in her divorce action, stated during the custody hearing that the divorce had since become final.

the time being, with Mother to provide all their transportation, and "Mr. Clement is not to transport the children at all." Father was also ordered to pay Mother child support of $180 per week.

### III. THE FINAL HEARING

The final hearing on the petitions to modify the parenting plan was conducted over two days, on October 16 and November 12, 2008. Mother acknowledged at the outset that Father had timely made all his child support payments since the court's order of August 14, and that she had provided all the required transportation. For his part, Father testified that he had passed three drug screenings at the Veterans Administration hospital since the prior hearing and had attended about 16 meetings of Alcoholics Anonymous. He also testified that he had not smoked any marijuana since that hearing and had not drunk any alcohol since August 11, when his counselor recommended that he abstain from alcohol completely and continue to attend A.A. meetings.

Although it appears that both parties fully complied with the trial court's order of August 14, 2008, Mother's testimony showed that compliance had its costs. She stated that in order to drive the children to and from school in Murfreesboro, she had to be on the road four hours a day and that the children had to be in the car with her two hours a day, for five days a week.[3] She explained that all the child support money she received from Father went for gas, that the children were exhausted after the daily drive, and that the driving schedule made extracurricular activities impossible.

The proof showed that Mother's parents, who are both retired, live in Williamson County and have been willing and able to help take care of the children. Mother's brother and an aunt also live nearby. The proof also showed that ten year old Preston suffers from asthma. Father's house in Murfreesboro is partially heated by a wood-burning fireplace, and this has apparently caused Preston to suffer several asthma attacks. His asthma may also have been exacerbated by Father's four dogs. Mother testified that she has had to ask Father and his girlfriend not to smoke in the children's presence. Father testified that he only smokes on the front porch and that Mother smokes too.

At the conclusion of testimony, the court announced its decision, which was memorialized in its final order, entered on January 14, 2009. The court again stated that Father had serious drug and alcohol problems and it declared that the parenting plan had never worked. It concluded that a material change of circumstances existed that "requires

---

[3]Mother's mother testified that she transported the children to and from Murfreesboro during their Saturday visitation with Father.

another look at what is in the best interest of these two boys."

The court did not set out a detailed analysis of the statutorily required factors for a determination of best interest, but simply cited Father's long history of substance abuse, calling it "the overriding factor" that the court cannot ignore. The court accordingly named Mother as the primary residential parent while awarding Father standard visitation, with the parties to continue to share joint responsibility for major decisions about the children. The court ordered the children to attend school where Mother is zoned "unless the parties agree otherwise." Father was also ordered to pay child support of $592 per month, in accordance with the income shares model in the child support guidelines.

## IV. ANALYSIS

### A. The Standard of Review

The standard of review in parenting arrangement cases is *de novo* upon the record of the trial court. The trial court's findings of fact are accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. Rule 13(d) T.R.A.P.; *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984). When the trial court makes no specific findings of fact, we must review the evidence to determine where the preponderance of the evidence lies. *Kendrick v. Shoemake,* 90 S.W.3d 566, 569-570 (Tenn. 2002); *Ganzevoort v. Russell,* 949 S.W.2d 293, 296 (Tenn. 1997).

The significance of parenting, or custody and visitation, arrangements are recognized as "among the most important decisions confronting a trial court." *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006). *See also*, *Curtis v. Hill*, 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006); *Shofner v. Shofner,* 181 S.W.3d 703, 715 (Tenn. Ct. App. 2004). In making such decisions, the needs of the child are paramount, with the desires of the parent being secondary. *Chaffin*, 211 S.W.3d at 286. Such decisions are factually driven and require the careful consideration of numerous factors. *Scarbrough v. Scarbrough,* 752 S.W.2d 94, 96 (Tenn. Ct. App. 1988). Since these decisions often hinge on the parties' credibility, appellate courts are reluctant to second-guess trial judges who have observed the demeanor of the witnesses and assessed their credibility. *See Gilliam v. Gilliam,* 776 S.W.2d 81, 84 (Tenn. Ct. App. 1988).

A trial court is accordingly vested with broad discretion in matters of child custody, and an appellate court will not interfere with a decision of the trial court except upon a showing of erroneous exercise of that discretion. *Hoalcraft v. Smithson*, 19 S.W.3d 822, 827 (Tenn. Ct. App. 1999). Such an error occurs when the parenting decision is based on a material error of law, or the evidence preponderates against it, or it is against logic and

reasoning. *See Hass v. Knighton*, 676 S.W.2d at 555; *Adelsperger v. Adelsperger,* 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997); *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996).

### B. A Material Change of Circumstances

A decision on a request for modification of a parenting arrangement requires a two-step analysis. *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003). A party petitioning to change an existing parenting order must prove by the preponderance of the evidence both (1) that a material change of circumstances has occurred and (2) that a change of custody or residential parenting schedule is in the child's best interest. *Kendrick v. Shoemake*, 90 S.W.3d at 575. "A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances which make the parenting plan no longer in the best interest of the child." Tenn. Code Ann. § 36-6-101(a)(2)(B).[4]

Father argues that the trial court erred in considering his drug and alcohol history to constitute a material change of circumstances, because those problems were known at the time of divorce, and a material change of circumstances only applies to those changes that could not have been reasonably anticipated at the time of the previous custody order. *Blair v. Badenhope*, 940 S.W.2d 575, 576 (Tenn. Ct. App. 1997). It appears to us, however that the trial court only considered Father's drug and alcohol abuse as it affected the children's best interest and that it relied on the parties' failure to adhere to the parenting plan as the sole basis for its finding of a material change.

Father does not deny that the parties did not adhere to the parenting plan, but he attempts to blame that failure on Mother alone. Father is also offended by the trial court's finding that both he and Mother committed a fraud on the court. He points to Mother's testimony that she entered into the original parenting plan with no intention of following it, and his own testimony that he fully intended to follow the plan as drafted, but that Mother intentionally interfered with his parenting time. He therefore asserts that Mother was the only one who perjured herself, and he concludes that she, and only she, has "unclean hands." He accordingly invokes the assistance of two familiar maxims of equity: "He who comes into equity must do so with clean hands," and "No one may take advantage of his own

---

[4]By its own terms, Tenn. Code Ann. § 36-6-101(a)(2)(B) applies to situations where "the issue before the court is a modification of the court's prior decree pertaining to custody." Another section of the same statute, Tenn. Code Ann. § 36-6-101(a)(2)(C), applies when "the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule." Both subsections include "failure to adhere to a parenting plan" as a possible basis for finding a material change of circumstance.

wrong." *See O'Brien v. O'Brien*, 734 S.W.2d 639, 643 (Tenn. Ct. App. 1987) (citing Gibson's suits in Chancery, 42 and 51). *See also, Best v. Best*, 773 S.W.2d 260, 261 (Tenn. Ct. App. 1989).

Both parties knew at the time of their divorce, however, that Mother was working three twelve hour shifts every week and that Father's work schedule was dictated by the volume of work he obtained and by the deadlines set by his clients. Thus, despite Father's testimony to the contrary, it is hard to avoid the conclusion that neither party intended to follow a schedule of alternating parenting time on a weekly basis. As the trial court observed, "[t]here's some dispute as to what they intended when they did the parenting plan, but there's really no dispute that they never followed it from the get-go."

Regardless of the parties' intent or potential misrepresentation to the trial court, the record contains evidence of a material change of circumstance which affects the children's well-being. Mother's move to Franklin made the existing parenting plan even more unworkable than it had been before. The parties now live in two different counties and the proof showed that when the children lived in Franklin with Mother, but went to school in Murfreesboro, the required commuting time exhausted them and made extracurricular activities impossible, thus having a detrimental effect on their well-being. The existing parenting arrangement would require similar travel every other week, regardless of which school the children attended.

This court was confronted with a very similar situation in the case of *Fox v. Gwirtsman,* No. M2004-00664-COA-R3-CV, 2005 WL 2140851 (Tenn. Ct. App. Sept. 6, 2005) (no Tenn. R. App. P. 11 application filed). In that case, as in the present case, the parents were awarded joint custody of their children, and shared parenting time on a nearly equal basis. The parents both lived in Davidson County, and the three children went to Nashville schools. Six months after the divorce, the mother moved to Murfreesboro, which was a more convenient location for her because of business reasons.

The mother filed a petition to modify the final decree of divorce to make her the primary residential parent so that the children could go to school in Murfreesboro. The trial court granted the mother's request. We affirmed. We found that the mother's change of residence was the only circumstance that changed, but that since it affected the children's well being in a meaningful way, the trial court was correct to consider changing the parenting plan in accordance with their best interest.

In the present case, Father complains that Mother undermined the parenting plan by unilaterally deciding to move from Murfreesboro to Franklin, and he implies that the court unjustly rewarded her for doing so. However, *Fox v. Gwirtsman* demonstrates that such a

move by a parent does not necessarily preclude a change of custody in that parent's favor, so long as the change is in the children's best interest. Mother testified that Father was often not available to take care of the children when she was working, and that she had to rely on her parents, who live in Williamson County, for child care in those situations. Mother thus demonstrated that she had a legitimate reason for moving and a reasonable plan for accommodating the children's needs.[5]

### C. The Best Interest of the Children

If a material change in circumstances has been proved, the court must then decide on a parenting plan or custody arrangement that serves the best interest of the children involved. Our legislature has set out the relevant factors for courts to apply in such situations. Tenn. Code Ann. § 36-6-106(a) (factors to consider in a custody determination); Tenn. Code Ann. § 36-6-404(b) (factors to consider in establishing a residential schedule). The trial court in this case did not refer directly to the statutory factors, so we must conduct our own independent review of the record to determine where the preponderance of the evidence lies. *Kendrick v. Shoemake*, 90 S.W.3d at 570; *Curtis v. Hill,* 215 S.W.3d at 839.

We must note at the outset that if we accept all of Father's testimony at its face value, the statutory factors do not strongly favor one party over the other. For example, neither parent produced any evidence to demonstrate greater love and affection towards their children than the other parent. Tenn. Code Ann. § 36-6-106(a)(1); Tenn. Code Ann. § 36-6-404(b)(7). Both parents have demonstrated a strong disposition "to provide the child(ren) with food, clothing, medical care, education and other necessary care." Tenn. Code Ann. § 36-6-106(a)(2); Tenn. Code Ann. § 36-6-404(b)(5). Both parents take active roles in the children's education, thus helping them establish a positive "home, school and community record." Tenn. Code Ann. § 36-6-106(a)(6). The conduct of the parents shows that both can be expected to "encourage a close and continuing parent-child relationship between the child(ren) and the other parent, consistent with the best interest of the child(ren)." Tenn. Code Ann. § 36-6-106(a)(10); Tenn. Code Ann. § 36-6-404(b)(3).

The trial court pointed to Father's long history of drug and alcohol abuse as a decisive factor in its determination. Father had testified to drinking four or five beers every day for years and to smoking marijuana on a frequent basis. He also testified that he stopped smoking marijuana after Mother moved to Franklin and that he abstained from alcohol after August 11, 2008 on the advice of his counselor. He stated that his abstention from marijuana gave him a new perspective, allowing him to realize that he had been using it to "numb

---

[5]Mother did not have to obtain permission from the court to move, since her new home is less than 100 miles away from Father's home. *See* Tenn. Code Ann. § 36-6-108.

myself." He also declared his readiness to totally give up alcohol if that was necessary for him to attain primary residential placement with his children.

Father testified that when they were married, Mother sometimes smoked marijuana with him, but there was no proof that she continued doing so after the divorce. Mother admitted under cross-examination that she sometimes buys a bottle of good wine and consumes it with friends over dinner. Despite the insinuations of Father's attorney, there was no proof that she ever overused or abused alcohol.

Thus, even though Father may have changed his habits for the better, Mother has a longer history of moderation than he does, and because the change in Father's habits is so recent, there remains a possibility that he may relapse, to the detriment of the children. The first factor set out in Tenn. Code Ann. § 36-4-404(b) is "[t]he parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult." Because of Father's recent drug history, Mother appears to be better situated than he is to accomplish that goal, and we believe that the trial court was correct to find that this factor tips the scales in her favor.

Aside from Father's history of drug and alcohol abuse, there is other evidence in the record which suggests that the best interest of the children lies in giving Mother primary parenting responsibilities. These include the environmental effect of Father's home on Preston's asthma, the willingness and availability of Mother's parents to care for the children when Mother is at work, and the still somewhat unsettled state of Father's relationship with Jennifer Ogden. In sum, the evidence does not preponderate against the trial court's finding that it was in the children's best interest for Mother to be named as their primary residential parent.

## V.

We affirm the judgment of the trial court. Remand this case to the Chancery Court of Rutherford County for any further proceedings necessary. Tax the costs on appeal to the appellant, Mark Clement.

_____
PATRICIA J. COTTRELL, JUDGE

-10-